James P. Rouhandeh (*pro hac vice*)
David B. Toscano (*pro hac vice*)
DAVIS POLK & WARDWELL LLP
450 Lexington Avenue
New York, New York 10017
Tel: (212) 450-4000
rouhandeh@davispolk.com
david.toscano@davispolk.com

Micah G. Block (SBN 270712)
Serge A. Voronov (SBN 298655)
DAVIS POLK & WARDWELL LLP
900 Middlefield Road, Suite 200
Redwood City, California 94063
Tel: (650) 752-2000
micah.block@davispolk.com
serge.voronov@davispolk.com

*Attorneys for Defendant Apple Inc.*

Sarah M. Ray (SBN 22970)
sarah.ray@lw.com
Aaron T. Chiu (SBN 287788)
aaron.chiu@lw.com
Blake R. Davis (SBN 294360)
blake.davis@lw.com
Brett M. Sandford (SBN 302072)
brett.sandford@lw.com
LATHAM & WATKINS LLP
505 Montgomery Street, Suite 2000
San Francisco, California 94111-6538
Telephone: +1.415.391.0600

Gary S. Feinerman (*pro hac vice*)
gary.feinerman@lw.com
LATHAM & WATKINS LLP
330 North Wabash Avenue, Suite 2800
Chicago, Illinois 60611-3695
Telephone: +1.312.876.7700

Christopher Bower (SBN 301379)
christopher.bower@lw.com
LATHAM & WATKINS LLP
555 Eleventh Street, NW, Suite 1000
Washington, DC 20004-1304
Telephone: +1.202.637.2200

**UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF CALIFORNIA**
**OAKLAND DIVISION**

| | |
|---|---|
| EPIC GAMES, INC.,<br><br>Plaintiff,<br><br>v.<br><br>APPLE INC.,<br><br>Defendant. | Case No. 4:20-cv-05640-YGR-TSH<br><br>**DEFENDANT APPLE INC.'S OPPOSITION TO PLAINTIFF EPIC GAMES, INC.'S MOTION TO ENFORCE ORDER RE PRODUCTION (DKT. 1727)**<br><br>Honorable Yvonne Gonzalez Rogers<br>Honorable Thomas S. Hixson |

# TABLE OF CONTENTS

PAGE

PRELIMINARY STATEMENT ........ 1

FACTUAL BACKGROUND ........ 5

ARGUMENT ........ 7

I. EPIC CITES NO PRECEDENT FOR ITS EXTRAORDINARY RELIEF ........ 7

II. THE RESPONSIVENESS RATE IS A FUNCTION OF EPIC'S OVERBROAD SEARCH TERMS AND CUSTODIANS ........ 8

III. EPIC'S "CASE-SPECIFIC" TERMS DO NOT SHOW THAT APPLE WITHHELD RESPONSIVE DOCUMENTS ........ 11

IV. THE LOWER NUMBER OF PRODUCED DOCUMENTS COMPARED TO THE PRIOR PROCEEDING REFLECTS THE DIFFERENCES BETWEEN THE TWO PROCESSES ........ 14

V. EPIC'S REQUESTED RELIEF WOULD BE UNDULY BURDENSOME AND CANNOT BE FULFILLED BY THE PROPOSED DEADLINE ........ 15

CONCLUSION ........ 18

# TABLE OF AUTHORITIES

PAGE

**Cases**

*BancPass, Inc. v. Highway Toll Admin., LLC*, 2016 WL 4031417 (W.D. Tex. July 26, 2016) ........ 8

*Boston v. ClubCorp USA, Inc.*, 2019 WL 1873293 (C.D. Cal. Mar. 11, 2019) ........ 8

*Epic Games, Inc. v. Apple Inc.*, 161 F.4th 1162 (9th Cir. 2025) ........ 14,15

*Finjan, Inc. v. SonicWall, Inc.*, 2020 WL 4192285 (N.D. Cal. July 21, 2020) ........ 8

*FlowRider Surf, Ltd. v. Pac. Surf Designs, Inc.*, 2016 WL 6522807 (S.D. Cal. Nov. 3, 2016) ........ 8

*Gray v. Faulkner*, 148 F.R.D. 220 (N.D. Ind. 1992) ........ 17

*O'Donnell/Salvatori Inc. v. Microsoft Corp.*, 339 F.R.D. 275 (W.D. Wash. 2021) ........ 4, 7, 8

*Realtek Semiconductor Corp. v. MediaTek, Inc.*, 732 F. Supp. 3d 1101 (N.D. Cal. 2024) ........ 16

**Rule**

Fed. R. Civ. P. 26 ........ 17

## PRELIMINARY STATEMENT

Defendant Apple Inc. ("Apple") opposes Plaintiff Epic Games, Inc.'s ("Epic") Motion to Enforce Order re Production (Dkt. 1727) (the "Motion").

In May 2026, the parties stipulated to a process by which Apple would produce the documents related to the decision-making process that led to the proposal set forth in its Proffer, and then Epic would have an opportunity to seek "additional" material it needed to evaluate and respond to Apple's proposal. After Apple produced all decision-making documents, Epic served Apple with 16 document requests and demanded searches from 27 custodians, most with no involvement in the decision-making process. After Epic refused to negotiate either the scope of custodians or breadth of its proposed search terms, Apple agreed to everything Epic demanded, and proceeded to implement Epic's discovery scheme without modification, mobilizing enormous resources to meet every deadline it agreed to. Despite Epic's demand that Apple complete its production by Thanksgiving (which Apple is on track to do), Epic suddenly (and without properly meeting and conferring) filed this motion on Friday asking the Court to order Apple to produce, by December 2, every nonprivileged document from 27 custodians that hit Epic's overbroad search terms, regardless of whether the document is responsive to any of Epic's requests. The Motion is legally and factually baseless and should be denied.

*First*, the Motion rests on unfounded factual assertions. Epic claims that Apple's production of documents from seven initial custodians *must be* "deficient" because the responsiveness rate across the Initial Custodian Document Population was "less than 1%."[1] But that rate—as set forth below—is demonstrably a function of Epic's overbroad search terms and custodians, not evidence that Apple withheld responsive documents. Epic's search terms were far from the "tailored" set Epic claims in its Motion, resulting in voluminous search term hits

[1] For purposes of this Opposition, Apple's references to the "Initial Custodian Document Population" refer to the 122,884 unique documents from the seven current or former Apple employees that Epic identified as priority custodians—Tim Cook, Eddy Cue, Carson Oliver, Kevan Parekh, Phil Schiller, Alex Roman, and Nate Barton (the "Initial Custodians")—that contain hits on one or more of Epic's search strings. (*See* Dkt. 1724 at 3–4.) Apple has substantially completed productions for these custodians; Apple's productions for the remaining 20 custodians remain ongoing.

unrelated to linking out. For example, Epic's search terms captured any documents (along with all attachments or other family members) that contained:

- Variations on the term "commission"—including references to, for instance, Apple's IAP commission, commissions charged by any other company, and any number of governmental and public "Commissions" and "Commissioners"—along with (anywhere else in the document—potentially hundreds of pages away) any one of the following terms: "contemporary," "contemporaneous," "note," "agenda," "presentation," "slide," "deck," "prepare," "debrief," "follow up," "financial," "revenue," "forecast," "projection," "model," "scenario," "analysis," "Japan," "EU," or "UK";
- Variations on the term "rate," along with (anywhere else in the document) any one of the following terms: "financial," "revenue," "projection," "model," "scenario," "analysis," "Japan," "EU," or "UK";
- Variations on the terms "feel," "feed," "feedback," "feet," and "feeble," along with (again, anywhere else in the document) words such as "contemporary," "contemporaneous," "appealing," "Brazil," or "Australia";
- The generic terms "comply" or "compliance," along with (anywhere else) any one of the terms: "dissuade," "discourage," "deter," "prevent," "suppress," "prohibit," "block," "encourage," "limit," "stop," or "viable";
- The common surnames "Thompson" and "Meyer"—anywhere in the document, without limitation; and
- The word "compass," also without limitation.

Documents pulled into the review based on these criteria—which are just some examples of the overbreadth of Epic's search terms —account for a *huge* percentage of the documents that had no relevance to Epic's requests and thus were not produced. In fact, *at least 95%* of the Initial Custodian Document Population hit on generic terms like these and did not include any reference to the term "link-out" or its variations, despite that concept being central to the Proffer and related discovery. These sweeping terms do not just increase the total volume of the Initial Custodian Document Population, they also captured highly sensitive and irrelevant documents, such as Apple employees' personal tax or financial records, medical records, documents discussing unannounced products, documents containing passwords, investor-relations materials, and privileged or protected legal communications. Epic did not employ "tailored search terms";

it used overbroad terms that swept in irrelevant documents and skewed responsiveness rates downward.

Epic obfuscates the unsurprising effect of its sweeping search terms. It argues that its search terms include *some* terms that are "tightly tied to this remand proceeding." (Dkt. 1727 at 11.) In doing so, Epic suggests the terms "proffer," "remand," and "YGR" resulted in 14,456 document hits from the Initial Custodians. (*Id.* at 14.) That assertion is wrong. Those terms were found in only 270 of those 14,456 documents. (Toscano Decl. ¶ 12.) The remaining 14,000 documents instead hit on generic terms included in that same search string. These include terms such as "contem*" (which is not limited to references to "contempt," as Epic incorrectly claims in its Motion) or "appeal*" (which can refer to *any* court appeal, as well as having common meanings outside of the litigation context), coupled with other generic terms.

Epic also claims that Apple's production to date is deficient because it should—but does not—contain similar types and volumes of documents as Apple produced in the prior proceeding. (Dkt. 1727 at 5, 13.) But, as Apple has informed Epic, the process here was fundamentally different. (Toscano Decl. ¶ 5, Ex 1 at 2.) The cross-functional teams responsible for designing, building, and launching the link-out program—including technical engineering, software engineering, UI design, collections, reporting process design, and external communications—were neither necessary to, nor involved in, the decision-making that led to Apple's proposed link-out commission in this remand proceeding. (*Id.*) Apple's link-out commission proposal in its Proffer was determined by four decision makers—Tim Cook, Eddy Cue, Kevan Parekh, and Carson Oliver—during a finite set of meetings, based on a finite set of documents, in reliance on outside experts, and within the constraints of the Ninth Circuit's decision. (Dkt. 1719 at 4; Dkt. 1720 at 4, 15–16; Dkt. 1724 at 4 n.4.) That process bears no resemblance to the wide-ranging process for launching an entirely new business program at issue in the prior proceeding. (Dkt. 1720 at 15–16.) The volume of Apple's prior productions does not and should not dictate the volume of produced documents in this remand proceeding.

*Second*, Epic's Motion should be denied because the requested relief would impose significant harm to Apple and its employees without providing any benefit to Epic, and because

it would be impossible to comply with by December 2. Given the technical and logistical difficulties of re-reviewing for privilege, privacy, and confidentiality issues; applying redactions to; and then producing hundreds of thousands of documents, Apple and its outside vendor believe that they could not meet Epic's proposed production deadline. (Leech Decl. ¶¶ 9-13; Barela Decl. ¶¶ 13-15.)

Additionally, the requested relief would impose an enormous burden on Apple and its employees and force the production of highly confidential and sensitive, personal information that is entirely irrelevant to this matter. The individual harm to Apple employees that would result from producing highly sensitive personal information with no relevance to the proceeding cannot be overstated. And the broader harm inherent in sharing a trove of competitively sensitive documents with a direct competitor cannot be justified. For its part, Epic has failed to identify any benefit, besides allaying its unsubstantiated suspicions, that it would receive from the production of hundreds of thousands of irrelevant documents, nor has it explained why it needs such documents to respond to the Proffer. And in the absence of evidence that Apple will not exert its best efforts to comply with this Court's order, coercive sanctions would be unnecessary and inappropriate.

The law is clear: parties are only required to produce *responsive* documents, not *every* document returned by a search string. *See, e.g.*, *O'Donnell/Salvatori Inc. v. Microsoft Corp.*, 339 F.R.D. 275, 277 (W.D. Wash. 2021) ("The Court will not compel defendants to produce any document simply because it contains a search term whether or not it is responsive to the discovery request."). Epic has not shown, and cannot show, why the regular discovery process should be disrupted here. Speculation based on hit counts, particularly where the producing party can explain low responsiveness rates, does not justify the extraordinary and unprecedented remedy Epic seeks.

Should the Court decide that some relief is warranted, Apple respectfully submits that the Court should look to the previously agreed and ordered procedure governing the review of privilege determinations set forth in the May 20 Joint Stipulation and Order Regarding

Proceedings on Remand (Dkt. 1687) (the "May 20 Order") governing discovery.[2] By December 2, Apple is prepared to produce a randomized, statistically significant sample of nonresponsive documents to a Special Master for review consistent with Epic's document requests subject to Apple's objections.

## FACTUAL BACKGROUND

Apple has complied with both the May 20 Order and the parties' subsequent agreements. In both its Motion to Shorten Time and the instant Motion, Epic mischaracterizes the May 20 Order as "requiring Apple to produce 'all' documents relating to the remand proceedings." (Dkt. 1725 at 5; *see also* Dkt. 1727 at 10 (describing the producible population as documents "relevant to the remand proceeding").) But the May 20 Order contains no such requirement. Rather, the May 20 Order first required Apple, within 10 days of filing its Proffer, to produce "all non-privileged documents *relating to the decision-making process leading to the proposal in its proffer*," along with a privilege log. (Dkt. 1687 ¶ 2 (emphasis added).) On August 13, 2026, Apple filed its Proffer and produced more than 1,800 documents, including the three expert reports that served as principal inputs to the link-out commission proposal and the documents and data on which the experts relied. (Toscano Decl. ¶ 3.) On August 24, Apple produced meeting invitations and nonprivileged portions of materials presented at, or distributed in connection with, the meetings of the four-person decision-making body responsible for the proffer proposal, along with a privilege log. (*Id.* ¶ 3.) The Proffer filing itself, along with the subsequent August 24 production, satisfied Apple's obligation to produce the nonprivileged documents relating to the decision-making process that led to Apple's proposal.[3]

The May 20 Order separately provided a process for Epic to identify additional materials—beyond the decision-making documents—that it believed it needed to evaluate and respond to Apple's proposal. Specifically, after Apple's production of the nonprivileged

[2] The parties have already agreed, as memorialized in the May 20 Order, to a third-party review of a subset of privilege determinations. (Dkt. 1687 ¶ 3.)

[3] On September 16, the parties negotiated a non-waiver agreement relating to the attorney-client privilege and the expert stipulation, leading to Apple's production on September 24 of draft expert reports and the factual portions of draft proffers that the decisionmakers received. (Toscano Decl. ¶ 7.)

documents and a privilege log, the parties were to meet and confer regarding "whether Epic believes it needs any additional material to evaluate and respond to Apple's proposal." (Dkt. 1687 ¶ 2.) Consistent with this second step of the May 20 Order, the parties met and conferred on August 28, and Epic conveyed its interest in additional categories of documents. (Toscano Decl. ¶ 4.) Nearly three weeks later, on September 11, Epic identified 16 categories of documents it wanted Apple to search for and produce. (*Id.* ¶ 6.) The parties met again on September 16 to discuss those requests, and Apple stated it would address them through a combination of targeted collections and proposed search-term-based custodial searches. (*Id.* ¶ 7.) Apple explained that the remand process was a narrow process involving four decisionmakers—Tim Cook, Eddy Cue, Kevan Parekh, and Carson Oliver—and Apple's initial custodian proposal included each of those four decisionmakers. Apple also stated it was willing to consider additional custodians if Epic identified specific individuals and explained why they were necessary despite not participating in the decision-making process. Apple proposed search terms on September 18 and seven custodians on September 21, including three additional custodians based on the September 16 meet and confer. (*Id.* ¶ 8.) On September 22, Epic rejected Apple's search terms, provided its own search terms and requested 20 additional custodians. (*Id.*) On September 25, Epic proposed that Apple's production should be completed by November 26. (*Id.*)

On October 5, Apple agreed to search for and produce, on a rolling basis, nonprivileged documents responsive to all 16 of Epic's requests, agreed to all 27 custodians proposed by Epic, and agreed to use all of Epic's proposed search terms. (Toscano Decl. ¶ 9, Ex. 2 (Oct. 5, 2026, Letter).) Apple agreed to address requests through custodial searches that went beyond the decision-making process, including:

- internal analyses of the financial or business impact of Apple's proposed linked-out commissions, alternative commissions, foreign commissions, and the zero-commission regime;
- communications relating to any strategies to dissuade developers from offering link-outs or to retaliate or discriminate against developers who did so;
- alternative methods of collecting developer revenue other than a linked-out-purchase commission; and

- analyses of developer costs, developer profitability, and breakage for linked-out transactions.

(*Id.* at 3-10.) Apple agreed to address Epic's other requests—which cover topics such as App Store R&D and Apple's analysis of costs relating to link-out transactions—through targeted manual ("go-get") collections. (*Id.*) Apple also warned that Epic's proposed search terms were overbroad and likely to return large numbers of nonresponsive documents. (*Id.* at 10-11.) Nevertheless, in the interest of avoiding delay, Apple agreed to run Epic's search terms across all 27 custodians and subsequently devoted substantial resources to collection, review, and production. Apple substantially completed production for the seven initial custodians by November 1 and remains on track to substantially complete production for the remaining custodians by November 25—consistent with the date Epic originally proposed for the completion of the production. (Toscano Decl. ¶ 8.) So far, Apple's document review vendor alone has logged 20,485 hours to meet these targets. (Leech Decl. ¶ 6). Apple has conducted and continues to conduct its document review consistent with the agreed scope of Epic's requests, as reflected in Apple's October 5 letter and subsequent communications between the parties.

In sum, Apple has agreed to produce responsive documents pursuant to the document requests that Epic propounded, from the files of the custodians Epic chose, using the search terms Epic demanded, and by the date Epic originally proposed for completion of the production. The timing here—and any purported delay—has been driven entirely by Epic, which notably took four weeks to even develop its discovery requests.

## ARGUMENT

### I. Epic Cites No Precedent for Its Extraordinary Relief

In its fifteen-page brief, Epic does not cite a single authority supporting the sweeping relief it now seeks. This is unsurprising: courts have rejected motions to compel the production of all documents returned by search terms regardless of relevance. *See, e.g.*, *O'Donnell/Salvatori Inc. v. Microsoft Corp.*, 339 F.R.D. 275, 277 (W.D. Wash. 2021) (holding that the producing party could withhold irrelevant documents returned by search terms

incorporated into a court order); *FlowRider Surf, Ltd. v. Pac. Surf Designs, Inc.*, 2016 WL 6522807, at *8 (S.D. Cal. Nov. 3, 2016) (same); *BancPass, Inc. v. Highway Toll Admin.*, LLC, 2016 WL 4031417, at *3 (W.D. Tex. July 26, 2016) (denying a motion to compel production of nonresponsive documents that hit upon agreed search terms); *see also Finjan, Inc. v. SonicWall, Inc.*, 2020 WL 4192285, at *3 (N.D. Cal. July 21, 2020) (noting that parties do not have on obligation to produce or log nonresponsive documents). Instead, the law is clear that "an agreement to run search terms does not waive the producing party's right to object based on relevance nor acquiesce to produce all resulting documents." *O'Donnell*, 339 F.R.D. at 277.

Courts decline to "compel defendants to produce any document simply because it contains a search term whether or not it is responsive to the discovery request," *id.*, particularly where the producing party "demonstrates that . . . the resulting 'hits' contain many irrelevant and unresponsive documents." *FlowRider*, 2016 WL 6522807, at *8. Epic bears the burden of establishing a basis to believe Apple is withholding responsive documents. *Boston v. ClubCorp USA, Inc.*, 2019 WL 1873293, at *8 (C.D. Cal. Mar. 11, 2019). Speculation that Apple is withholding material does not disturb the well-settled principle that litigants are only entitled to relevant documents, not all documents for which they can concoct a search string. *Id.* ("A plaintiff's mere suspicion that additional documents must exist does not warrant an order compelling production."). Here, the law's guidance aligns with the facts and the equities—Epic's extraordinary demands should be denied.

## II. The Responsiveness Rate Is a Function of Epic's Overbroad Search Terms and Custodians

Epic's Motion rests on the speculative premise that Apple's responsiveness rate must reflect a defective review. But as Apple has explained from the beginning, the low responsiveness rate is the predictable result of the overbroad search terms that Epic refused to modify, not evidence that Apple withheld responsive documents. Apple repeatedly informed Epic that its search terms were likely to return large numbers of nonresponsive documents. (Dkt. 1720 at 10-12; Dkt. 1724 at 4; Ex. 3 to Toscano Decl. at 2.) That is exactly what has happened. Epic's search terms used generic business words, broad jurisdictional terms, wildcard terms, and

virtually no limiters. As a result, those terms returned documents entirely unrelated to this proceeding.

Fully half of Epic's search strings contain the following facially overbroad terms—fee*, commission* or rate*—resulting in a high volume of documents that do not even hit on the presumably intended terms:

- **Fee*:**[4] Epic's use of "fee*" in its search strings related to litigation and Apple's link-out-related projects pulled in documents containing words like "feel," "feed," "feedback," "feet," and "feeble" without the word "fee" or "fees" appearing at all. Consider Epic's search substring *appeal* AND fee**, which hits on 5,335 documents in the Initial Custodian Document Population, or 10,955 including families. But over half of these documents—2,745 documents, or 5,315 including families—hit on "feel*," "feet*," "feed*," or "feeb*" without containing "fee" or "fees," and only three of these were determined to be responsive to Epic's requests.

  Epic's jurisdictional search string confirms the same problem. This search string combined geographic terms such as "Japan," the "European Union," the "United Kingdom," "Brazil," and "Australia" with "fee*." As written, the search string containing geographic terms coupled with "fee*" hits 27,270 documents in the Initial Custodian Document Population, or 47,978 including families. But almost 70% of those documents hit on words like "feeling" or "feedback" without containing "fee" or "fees." Thus, the majority of the documents in that substring were not even captured by the term "fee" that Epic presumably intended to search.

- **Commission*:** Epic's search strings regarding litigation, commission structure, financial impact, link-out projects, and licensing all contain the term "commission*." This term captures documents that refer to government and private commissions, as well as documents hitting on the totally irrelevant term "commissioner," such as documents discussing the NFL Commissioner. Every single one of the documents in the Initial Custodian Document Population containing the term "commissioner" and not "commission" or "commissions" were deemed nonresponsive.

  Moreover, Epic couples "commission*" with generic financial terms like "scenario," "analysis," "financial," and "revenue." These generic financial terms and "commission*" hit on 11,325 documents in the Initial Custodian Document Population (18,061 including families). A total of 11,050 of these documents were determined to be nonresponsive.

---

[4] As the Court may recognize, the use of a wildcard in a search string is designated by the asterisk symbol, which means that the search string will hit on any term that includes the prefix before the asterisk.

- **<u>Rate*:</u>** The term "rate*" was ostensibly included in Epic's search strings to capture documents discussing the link-out commission rate. However, this term also captures unrelated words such as "rated." When combined with the generic financial terms like "revenue" and jurisdictional terms like "Japan" from Epic's search strings, there are 2,754 documents in the Initial Custodian Document Population that only contain the word "rated," rather than "rate" or "rates." These documents include analyst reports covering stocks that are "not-rated," documents discussing apps "rated 18+," documents discussing how certain apps have been "rated" by customers, and internal financial documents discussing "pro-rated" figures, such as pro-rated bonuses. All of these documents were deemed nonresponsive.

(Toscano Decl. ¶¶ 13-16.) The inevitable result of Epic's inclusion of these three overinclusive search terms—fee, commission, and rate—was a massive increase in overall document hit counts and a decrease in responsiveness. Additionally, these and other overly broad search terms also sweep in highly sensitive business and personal materials, including personal tax or financial records, documents discussing unannounced products, documents containing passwords, investor-relations materials, and privileged or protected legal communications.

Epic's Motion ignores the overbreadth problem, claiming its searches are "tailored." (Dkt. 1727 at 6.) They are not. For example, Epic claims its search string aimed at capturing "financial analyses of a commission or link-outs" is "targeted," (Dkt. 1727 at 14), even though a staggering 95% of the documents in the Initial Custodian Document Population that hit on this search string do not even mention the term "link out" or its variations. (Toscano Decl. ¶ 17.) Rather, the majority of these documents hit on generic financial terms like "scenario," coupled with either "commission*" or "rate*," which are overinclusive for the reasons described above. In other words, the very search strings Epic chose to highlight in its brief themselves demonstrate the problems with its approach. They show that Epic's decision to employ broad search terms, including wildcard search terms, resulted in a significantly broader collection of documents than the so-called targeted search terms that Epic apparently thought it was proposing.

These examples are not isolated. Epic's decision not to require "link out," "linkout," "link-out," or "link entitle*" as a limiter pulled in enormous volumes of nonresponsive material. Documents hitting on search strings with "fee*," "rate*," or "commission*" without link-out variants accounted for well over 57,000 nonresponsive documents and over 103,000 documents

with families, roughly 84% of the total Initial Custodian Document Population. (Toscano Decl. ¶ 18.) Search strings with "fee*," "rate*," or "commission*" combined with other generic search strings, such as:

- Search strings containing generic jurisdiction terms (i.e., "Japan") and "structure*," "alternative*," "comply*," or "compliance";
- Search strings hitting on generic terms related to prohibition such as "dissuad*," "deter*," or "prevent*" coupled with variations on the word "comply";
- Search strings that only include words like "compass" or common last names like "Meyer" and "Thompson" with no additional limiter; and
- The terms expert* AND report,

result in a total of about 117,000 nonresponsive documents—or about 95% of total document hits. (*Id.* ¶ 19.) That is because they do not hit on—and were not required to hit on—any variations on the term "link out." In fact, over 98% of the Initial Custodian Document Population do not include the term "link out" or its variants *at all*. (*Id.*) When considering the subject matter of the current discovery—the link-out proposal in Apple's proffer—Epic's decision to make the term "link out" mandatory in only one of its ten search strings is perplexing.

Epic argues it is "utterly implausible" that the search terms that Epic "crafted with this remand proceeding in mind" resulted in a low responsiveness rate. (Dkt. 1727 at 14.) But a low responsiveness rate was in fact the direct and foreseeable consequence of searching the records of custodians not involved in the Proffer decision-making process using generic wild card terms such as commission*, rate*, and fee*, variations of which Apple uses in its business every day without referring to the issues in this case. Epic argues that Apple cannot be trusted because its review of Epic's poorly crafted search terms resulted in a low responsiveness rate. The premise is backwards: the evidence from the review demonstrates that Epic's search terms were overbroad as expected, not that there was anything wrong with Apple's review.

## III. Epic's "Case-Specific" Terms Do Not Show That Apple Withheld Responsive Documents

Along with the general shortcomings of Epic's preferred search terms, Epic's argument that Apple is improperly withholding documents even though they hit on "case-specific terms"

and terms "tightly tied to this remand proceeding," such as "proffer," "contempt," "injunction," "link-out," and "breakage" (*Id.* at 5, 11), is untethered to the facts. These terms are not narrowly drafted, they do not contribute to a substantial portion of the review population, and, where they do appear, they often are not responsive.

*First*, the five supposedly "case-specific" terms that Epic points to—taken together—make up only a minuscule portion of the total documents with search term hits. Only 3% of the Initial Custodian Document Population contains any of these terms at all.[5] (Toscano Decl. ¶ 21.) More specifically:

- The term "proffer," when run across the Initial Custodian Document Population within the context of Epic's search string, hits on about 56 documents, 19 of which have been marked responsive to Epic's requests by the document reviewers. This reflects a responsiveness rate of about 34%. (*Id.* ¶ 23.)
- Similarly, there are only 716 documents that hit on the term *"injunction"* within the context of Epic's search string including this term, 47 of which were deemed responsive. (*Id.* ¶ 24.)
- Epic states in its Motion that the term "link out" is a "case-specific" term—indeed, one that is central to this litigation—yet documents that hit on this term *at all*, irrespective of any additional search string limiters, represent 1.77% of the Initial Custodian Document Population, and have a responsiveness rate of 20%. (*Id.* ¶ 25.)
- The term "breakage" as it appears in Epic's search string only hits on 163 documents in the Initial Custodian Document Population. (*Id.* ¶ 26.) A total of 105 of those documents were deemed responsive by Apple's document review team, reflecting a 64% responsiveness rate. (*Id.*)
- As explained below, "contempt" is not a specific search term, as written by Epic. Notwithstanding this misstatement, the narrower root word "contempt*," when paired with Epic's search string limiters hits on only 589 documents, or 1,170 inclusive of families. (*Id.* ¶ 20.)

[5] On a similar tack, Epic argues that the terms "remand" and "YGR" are "not common in everyday business interactions" and therefore, in Epic's view, should return a high volume of responsive documents. (Dkt. 1727 at 14.) But Epic has its facts wrong. Although Epic suggests that the terms "remand" and "YGR," as well as "proffer," returned "14,456 documents" and "Apple produced only 162" of them (*id.*), Epic misunderstands its own search string. In reality, the three terms Epic identifies make up a small part of Epic's search string, and only 270 documents hitting on the search string contain *any* of these three terms. (Toscano Decl. ¶ 12.)

About 74% of the documents that Apple's review team determined were responsive hit on one of these five "case-specific" terms, demonstrating conclusively that these terms are not the reason Epic's search terms generated largely nonresponsive documents. (*Id.* ¶ 21.)

*Second*, even these more relevant search terms are not at all appropriately tailored. Epic characterizes "contempt" as one of its "case-specific" search terms (Dkt. 1727 at 5); but Epic did not include "contempt" as a search term. Rather, the search term is the broader "contem*," which encompasses "contempt," but also captures documents hitting on words like "contemporary," "contemporaneous," and "contemplate." In fact, Epic's full search string containing the root "contem*" hits on 2,494 documents, or 5,907 documents inclusive of families. (Toscano Decl. ¶ 20.) However, when the narrower root word "contempt*" is substituted for "contem*," there are only 589 documents that hit on the search string, or 1,170 inclusive of families, as set forth above. (*Id.*)

*Finally*, the documents that contain the terms Epic deems to be "case specific" are frequently not responsive. Simply hitting on one of these terms is not enough to establish responsiveness. Rather, such documents would still need to correspond to one or more of Epic's custodial search requests which sought communications relating to the decision-making process by which the commission proposal in the Proffer was determined and any related materials (Requests 1, 3); documents containing Apple's internal analyses of financial or business impact of the proposed commission structure, the zero commission structure, and alternative commission structures, including in foreign jurisdictions (Requests 4, 5, 12); communications relating to strategies to dissuade developers from offering link-outs (Request 6); alternative methods of collecting developer revenue besides commissions on linked-out purchases (Request 7); analyses of developer costs and profitability related to link-out transactions (Requests 14, 15), and breakage rates for linked-out transactions (Request 16). (*See* Ex. 2 to Toscano Decl. at 3-10.) The documents that hit on the five so-called "case-specific" terms and were not produced were withheld because they were not responsive to these document requests, which seek specific communications, analysis, and materials related to the Proffer and link-out commissions.

In short, Epic points to examples of "case-specific" search terms coupled with low responsiveness rates as evidence of Apple's "unreasonable . . . view of responsiveness." (Dkt. 1727 at 5, 14.) However, Epic's own examples of supposedly targeted search terms are in fact not specific, are not automatically responsive, and are a small proportion of the review population. Nevertheless, the fact that documents with such terms showed a significantly higher responsiveness rate demonstrates Apple's good faith review. What is missing from Epic's analysis, once again, is the impact of its many overbroad and unrelated search terms beyond the select few it has highlighted.[6]

## IV. The Lower Number of Produced Documents Compared to the Prior Proceeding Reflects the Differences Between the Two Processes

Epic's volume comparison ignores a basic point: a decision-making record reflects the process that produced it. The 2023 link-entitlement process and the 2026 remand proposal were not the same process. In 2023, Apple was deciding what commission to charge on a type of transaction that had never before occurred on its platform and was designing, building, and launching the program through which those transactions would occur. That ordinary-course business launch ran through Apple's pricing machinery and generated the kinds of documents such a process would generate, including business-team decks, financial models, and Price Committee materials.

The 2026 remand process was different. After the Ninth Circuit held that Apple could begin charging a commission on linked-out purchases after this Court approved it, the question for Apple was not what commission to implement as a business matter, but what commission to propose to the Court under the legal standards set out in the Ninth Circuit's opinion and supported by evidence. *See Epic Games, Inc. v. Apple Inc.*, 161 F.4th 1162, 1187-88 (9th Cir.

[6] Epic first surfaced its demand for production of all nonprivileged documents that hit on its search terms—hundreds of thousands of documents—by email the day before filing its motion. (Dkt. 1727 at 4.) Epic's own declaration confirms that this request never arose during the parties' prior meet-and-confer discussions. (*See* Even Decl. ¶¶ 7-10.) Epic thus failed to confer with Apple "for the purpose of attempting to resolve all disputed issues," as Civil Local Rule 37-1(a) requires. If Epic had engaged in a good faith meet-and-confer process, Apple could have informed it of its mistake and spared the Court from needing to address this dispute. Instead, the parties did not have the opportunity to attempt to resolve this dispute without Court intervention.

2025). Those standards called for economic, valuation, and technical analyses—including whether proposed rates would be prohibitive and the value of Apple intellectual property used by developers—that Apple does not prepare in the ordinary course of commercial pricing. The cross-functional teams involved in designing, building, and launching the link-entitlement program had no role in proposing a commission in this proceeding.

That difference explains the record. There was no Price Committee process and no business-team workstream; the absence of Price Committee materials reflects the process Apple actually undertook, not a gap in Apple's production. A process of this kind generated a different record: meeting invitations, materials presented at those meetings, draft proffers and expert reports circulated to the decisionmakers, final expert reports, and the data on which those reports relied. Apple produced the nonprivileged materials from that record, as well as draft proffers and draft expert reports the decisionmakers received.

Epic's volume comparison proves nothing. It makes perfect sense that a constrained remand process—limited by the Ninth Circuit's decision and focused on a commission proposal to this Court—would generate a much smaller and less diverse set of documents as compared to Apple's prior launch of an entirely new business model. Despite Apple having previously clarified this difference (Dkt. 1720 at 15-16), Epic's argument depends on an unfounded assumption that these two processes were the same. They were not. The lower volume reflects the narrower process Apple actually undertook, not a defective responsiveness review.

## V. Epic's Requested Relief Would Be Unduly Burdensome and Cannot Be Fulfilled by the Proposed Deadline

Epic seeks to justify its requested extraordinary relief—the production of hundreds of thousands of irrelevant documents from a business competitor in less than a month, enforced by coercive sanctions—through a cursory burden analysis and mischaracterizations of the ongoing discovery process. Neither holds up to scrutiny.

Epic ignores the tremendous burden and harm its requested relief would impose on Apple and its employees. Consistent with industry practice, Apple's reviewers did not further code or redact nonresponsive documents. (Leech Decl. ¶ 8). So Apple would have to re-review

hundreds of thousands of documents (regardless of responsiveness) for privilege, confidentiality, personally identifiable information, trade secrets, commercially sensitive business information, source code, unannounced hardware products, and other protected material *and* painstakingly apply redactions to an unknown number of those documents before any production could occur.[7] Apple's experienced vendors anticipate that this review would require more than 17,000 additional reviewer hours to complete, requiring approximately three weeks of review, followed by an additional 7-10 working days to generate a production file of this magnitude. (Leech Decl. ¶ 11; Barela Decl. ¶ 15). This would be a Herculean task on any timeline. With Epic's proposed deadline less than two weeks from the present date and eight days from the ordered hearing—while Apple is continuing to review and produce *responsive* documents from the additional 20 custodians—it is simply impossible. (*Id.*) In the process, Apple would incur significant expense, risk the inadvertent disclosure of privileged, personal, or otherwise protected documents, and operate for even longer under a zero link-out commission regime, all so Epic could receive troves of documents unrelated to the matter at hand.

These immediate litigation burdens are magnified by the farther-reaching risk inherent in turning over vast quantities of nonresponsive documents to a direct corporate competitor. *See Realtek Semiconductor Corp. v. MediaTek, Inc.*, 732 F. Supp. 3d 1101, 1118 (N.D. Cal. 2024) (noting, in addition to the familiar burdens of discovery on a producing party, the added risk of "the possible disclosure of sensitive business information to a competitor").

It would also harm Apple's officers and employees by requiring the production of sensitive personal information, which would be included in Epic's proposed production as a result of its extraordinarily broad search terms. This includes personal correspondence, medical information, and financial records of senior executives, notes reflecting employee passwords, and performance reviews and compensation information. These plainly irrelevant documents

---

[7] The Order re Discovery of Electronically Stored Information permits the parties to redact privileged documents, "protected personal information subject to non-disclosure obligations imposed by governmental authorities, law, or regulation," and "information about unannounced hardware products that are still in active development." (Dkt. 245 at 8.)

were swept up in the collection with the understanding that they would be reviewed and filtered for relevance. *See Gray v. Faulkner*, 148 F.R.D. 220, 223 (N.D. Ind. 1992) (declining to order the production of documents because "the court is reluctant to order the unconditional production of documents which might adversely affect the security of the institution or reveal personal information having no relevance to the subject matter of the present action").

Conversely, Epic has not explained why it needs these nonresponsive documents in order to respond to Apple's Proffer proposal. "A party claiming that a request is important to resolve the issues should be able to explain the ways in which the underlying information bears on the issues as that party understands them." Fed. R. Civ. P. 26 advisory committee's note to 2015 amendment. Documents related to the NFL "Commissioner" or employee "feedback" —among many other similar examples—will be of no use in this proceeding. Nor will senior executives' tax returns and medical records. And production will not satisfy Epic's real objection—that Apple did not create some of the documents Epic wishes it did. Without evidence that Apple has withheld responsive documents, Epic's speculation cannot be used to fabricate prejudice to itself.

Epic also accuses Apple of foot dragging and noncompliance. (Dkt. 1727 at 14.) But, as explained above, Apple has complied with the May 20 Order, producing the documents related to the decision-making process that led to the Proffer. After a delay awaiting Epic's overbroad custodian and search term proposals for additional documents and after Epic refused to negotiate to narrow them, Apple accepted both without modification. Since then, Apple has worked diligently to review hundreds of thousands of documents on a short timeline, evaluating responsiveness using Epic's own document requests subject to Apple's objections. In doing so, Apple has met the targets communicated to the Court in joint status reports and remains on track to substantially complete production in just over one week and within the original deadline requested by Epic. Apple has not been a source of delay in the present discovery process. Rather, at every step it has prioritized the timely completion of discovery and minimizing any burden on the Court over other equities.

Indeed, the delays in the discovery process so far are attributable to Epic, not Apple. It is Epic that delayed providing document requests for additional material to evaluate Apple's

proposal, and Epic that rejected Apple's more narrowly tailored custodians and search terms that would have allowed for a faster review and production. Nevertheless, Apple remains on track to substantially complete production by the date Epic originally requested.

Epic asserts—without providing any basis—that developers "are waiting on the sidelines" to link out. (Dkt. 1725 at 4.) But Apple has charged and will continue to charge a zero percent commission pending the outcome of this remand proceeding. Since adopting zero commissions, Apple has seen a substantial increase in linking out and an associated loss of revenue. It expects this trend to continue so long as the injunction remains in place. (*See* Dkt. 1708 at 11-12 (describing how, under the zero-commission regime, "U.S. developers have . . . actively directed users towards alternative payment channels through link-outs," which has "materially impacted Apple's App Store billings in the U.S.").) Apple is harmed under the current posture while Epic benefits, so it is unsurprising that Apple has been working diligently to complete its production.

Finally, there is no basis for coercive sanctions. Apple remains on track to substantially complete productions for all custodians by November 25. It has not refused to produce any relevant documents, and it would promptly comply with any Court order to the best of its abilities. If Epic wishes to facilitate a faster review, tailored search terms, rather than coercive sanctions, were and are the path forward.

## CONCLUSION

For the foregoing reasons, Apple respectfully submits that Epic's Motion should be denied.

In the alternative—and as set forth above—while Apple maintains that no relief is justified or needed, if the Court is inclined to grant some form of relief, Apple respectfully submits that it should order the production, by December 2, of a randomized, statistically significant sample of nonresponsive documents to a Special Master for review consistent with Epic's document requests subject to Apple's objections.

Dated: November 18, 2026

Respectfully submitted,

*/s/ James P. Rouhandeh*

DAVIS POLK & WARDWELL LLP
James P. Rouhandeh (*pro hac vice*)
David B. Toscano (*pro hac vice*)
450 Lexington Avenue
New York, New York 10017
Tel: (212) 450-4000
rouhandeh@davispolk.com
david.toscano@davispolk.com

Micah G. Block (SBN 270712)
Serge A. Voronov (SBN 298655)
900 Middlefield Road, Suite 200
Redwood City, California 94063
Tel: (650) 752-2000
micah.block@davispolk.com
serge.voronov@davispolk.com

LATHAM & WATKINS LLP
Sarah M. Ray (SBN 22970)
sarah.ray@lw.com
Aaron T. Chiu (SBN 287788)
aaron.chiu@lw.com
Blake R. Davis (SBN 294360)
blake.davis@lw.com
Brett M. Sandford (SBN 302072)
brett.sandford@lw.com
505 Montgomery Street, Suite 2000
San Francisco, California 94111-6538
Telephone: +1.415.391.0600

Gary S. Feinerman (*pro hac vice*)
gary.feinerman@lw.com
330 North Wabash Avenue, Suite 2800
Chicago, Illinois 60611-3695
Telephone: +1.312.876.7700

Christopher Bower (SBN 301379)
christopher.bower@lw.com
555 Eleventh Street, NW, Suite 1000
Washington, DC 20004-1304
Telephone: +1.202.637.2200

*Attorneys for Defendant Apple Inc.*