GARY A. BORNSTEIN (*pro hac vice*)
gbornstein@cravath.com
YONATAN EVEN (*pro hac vice*)
yeven@cravath.com
LAUREN A. MOSKOWITZ (*pro hac vice*)
lmoskowitz@cravath.com
MICHAEL J. ZAKEN (*pro hac vice*)
mzaken@cravath.com
M. BRENT BYARS (*pro hac vice*)
mbyars@cravath.com
**CRAVATH, SWAINE & MOORE LLP**
375 Ninth Avenue
New York, New York 10001
Telephone: (212) 474-1000
Facsimile: (212) 474-3700

MATTHEW J. ADLER (SBN 273147)
matthew.adler@faegredrinker.com
**FAEGRE DRINKER BIDDLE & REATH LLP**
Four Embarcadero Center
San Francisco, California 94111
Telephone: (415) 591-7500
Facsimile: (415) 591-7510

*Attorneys for Plaintiff and Counter-defendant*
*Epic Games, Inc.*

**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF CALIFORNIA**
**OAKLAND DIVISION**

| | |
|---|---|
| EPIC GAMES, INC.,<br><br>Plaintiff, Counter-defendant,<br><br>v.<br><br>APPLE INC.,<br><br>Defendant, Counterclaimant. | Case No. 4:20-CV-05640-YGR-TSH<br><br>**PLAINTIFF EPIC GAMES, INC.'S REPLY MEMORANDUM IN SUPPORT OF MOTION TO ENFORCE ORDER RE PRODUCTION**<br><br>Date: November 24, 2026<br><br>Courtroom: E, 15th Floor<br><br>Judge: Hon. Thomas S. Hixson |

**TABLE OF CONTENTS**

**Page**

I. The Court Has Authority to Enforce Its Own Order....2

II. The Low Responsiveness Rate Reflects Apple's Exceedingly Narrow Approach Toward Responsiveness, Not a Flaw in Epic's Search Terms....4

III. Apple's Analysis of Case-Specific Terms and Categories of Withheld Documents Confirms That It Is Withholding Responsive Documents....6

IV. The Requested Relief Is Proportionate, and Apple's Claims of Burden and Competitive Harm Are Unsubstantiated....8

V. Alternative Remedy....12

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Apple Inc. v. Epic Games, Inc.*,
2026 WL 1250097 (U.S. May 6, 2026) ....................9

*BancPass, Inc. v. Highway Toll Admin., LLC*,
2016 WL 4031417 (W.D. Tex. July 26, 2016) ....................3

*Cahill v. Insider Inc.*,
131 F.4th 933 (9th Cir. 2025) ....................3

*Epic Games, Inc. v. Apple Inc.*,
2026 WL 1215632 (9th Cir. Apr. 28, 2026) ....................9

*Epic Games, Inc. v. Apple Inc.*,
781 F. Supp. 3d 943 (N.D. Cal. 2025) ....................4

*Finjan, Inc. v. SonicWall, Inc.*,
2020 WL 4192285 (N.D. Cal. July 21, 2020) ....................3

*FlowRider Surf, Ltd. v. Pac. Surf Designs, Inc.*,
2016 WL 6522807 (S.D. Cal. Nov. 3, 2016) ....................3

*In re McKesson Governmental Entities Average Wholesale Price Litig.*,
264 F.R.D. 595 (N.D. Cal. 2009) ....................8

*O'Donnell/Salvatori Inc. v. Microsoft Corp.*,
339 F.R.D. 275 (W.D. Wash. 2021) ....................3

*Peskoff v. Faber*,
251 F.R.D. 59 (D.D.C. 2008) ....................8

*Practical Magic, LLC v. Petzinger*,
2024 WL 1191066 (C.D. Cal. Mar. 5, 2024) ....................11

Two and a half years ago, the Court entered an order requiring production of "all" documents "relative to the decision-making process leading to the link entitlement program and associated commission rates." (Dkt. 974.) Apple failed to comply. Six months ago, the Court entered a similar order again requiring Apple to "produce to Epic all non-privileged documents relating to the decision-making process leading to the proposal in its proffer." (Dkt. 1687 ("Order") ¶ 2.)[1] Apple has again failed to comply. The basis for withholding documents has shifted from assertions of privilege to assertions of non-responsiveness, but the outcome is the same, as is its effect on Epic, the Court and the schedule.

The statistics in Apple's opposition (Dkt. 1731 ("Opposition" or "Opp.")) confirm the unduly narrow and improper relevance standard Apple has applied. As explained in Epic's Motion, Apple produced well under 1% of documents that hit the agreed-upon search terms. (*See* Mot. at 2, 11.) Apple attributes this low responsiveness rate to Epic's purportedly "overbroad" search terms (Opp. at 8), but Apple's hit report data contradict that explanation. Tellingly, in the files of the seven Initial Custodians, which include the four people that Apple has identified as the decision-makers here, Apple deemed non-responsive more than ***95%*** of the documents hit by the search terms that ***Apple itself*** proposed. (Dkt. 1732 ("Toscano Decl.") ¶ 27.) The pattern holds even for the terms most closely tied to this remand. Apple has withheld as non-responsive at least 3,482 of the 3,932 documents, or approximately 88.6%, in the Initial Custodians' files that contain the terms that are the very subject of this remand: "link-out" (and variations thereof), "proffer," "contempt," "injunction," and "breakage." (*Id.* ¶ 21; Opp. at 12.) Those figures—both the non-responsiveness percentages and the tiny number of documents produced—point to only one explanation: a responsiveness standard far too narrow to satisfy the Order.

The documents that Apple has produced confirm the point. For example, Apple's production from its senior executives contains no substantive internal communications about the rates Apple ultimately proposed, including (as Epic requested) the programs using those rates that Apple has implemented in other jurisdictions—where Apple supposedly did go through some

[1] Capitalized terms not defined herein have the same meaning as in Epic's Motion (Dkt. 1727 ("Motion" or "Mot.")).

version of the "wide-ranging process" that Apple suggests it declined to undertake in the United States. (Opp. at 3; *see* Mot. at 7, 10; Dkt. 1727-2 at 2.) Indeed, Apple acknowledges that the documents it withheld from the Initial Custodians' files include "financial summaries, revenue and pricing materials." (Toscano Decl. ¶ 26.) It is simply not credible that Apple's decision-makers were shielded from the business for several months, such that they have almost no ordinary-course business documents addressing the "financial or business impact of Apple's proposed linked-out commissions, alternative commissions, foreign commissions, and the zero-commission regime," all of which are documents that Apple concedes it should have produced. (Opp. at 6.)

Unable to defend its review, Apple rewrites the history that preceded it. Apple claims that Epic "refused to negotiate" or narrow its custodians and search terms. (Opp. at 1, 17.) The record shows otherwise. The Parties met and conferred repeatedly, and Epic cut the contempt proceeding's 53 custodians nearly in half to 27 custodians. Apple then accepted Epic's reduced custodian list and Epic's search terms without seeking further conferral or proposing any further changes. (Mot. at 6-7; Dkt. 1720 at 6-7.) And the Parties met and conferred on November 6 and November 11 about the relevance standard at issue here. (Dkt. 1727-1 ("Even Decl.") ¶¶ 10-11.) Any burden Apple now claims is of its own making, and the Protective Order and ESI Protocol already address the confidentiality and privilege concerns Apple invokes.

The Court should grant Epic's requested relief: an order requiring Apple to (i) produce all non-privileged documents that hit on any of the agreed search terms by December 2, 2026 (one week after Apple's deadline to substantially complete production), without any review for responsiveness or relevance; and (ii) pay a daily monetary sanction for each day after December 2, 2026 that it fails to comply. In the alternative, if the Court orders review of a random sample to evaluate Apple's relevance determinations, Epic, not a special master, should conduct this review.

## I. The Court Has Authority to Enforce Its Own Order

In its opening Motion, Epic explained that because Apple has engaged in a pattern of delay and refused to conduct a good-faith review of its documents, this Court should order

Apple to produce all non-privileged documents that hit on Epic's search terms. In response, Apple argues that Epic does not cite any cases granting such relief. (Opp. at 7-8.) Apple mischaracterizes Epic's request and this Court's authority.

*First*, contrary to Apple's suggestion, Epic does not seek all documents hitting on search terms for their own sake, regardless of relevance. Rather, what Epic wants are the documents Apple was required to produce under the Court's Order. (Order ¶ 2 (requiring Apple to "produce to Epic all non-privileged documents relating to the decision-making process leading to the proposal in its proffer.").) Epic requests the broader production because, given Apple's behavior, it appears to be the only way Epic can timely obtain what it is entitled to receive.

*Second*, Epic's requested relief is well within the authority of this Court to grant. "A district court possesses inherent powers that are governed not by rule or statute but by the control necessarily vested in courts to manage their own affairs so as to achieve the orderly and expeditious disposition of cases. Those powers include the inherent authority of a court to enforce its orders by whatever means . . . ." *Cahill v. Insider Inc.*, 131 F.4th 933, 938 (9th Cir. 2025) (citations omitted). This is exactly what Epic has requested. (Mot. at 12.)

Apple cites a string of cases for the proposition that courts "reject[] motions to compel the production of all documents returned by search terms regardless of relevance." (Opp. at 7-8.) But these cases arise from motions to compel discovery in the first instance, not motions to enforce a Court order. And they do not have the history of extraordinary non-compliance present here.[2] Apple's Opposition elides this history, but it is stark, and the Court knows the history from the contempt proceedings well. To briefly recap the current set of issues, Apple was ordered to produce "all" non-privileged documents relating to its decision-making process on the commission proposed in the Proffer (Order ¶ 2), but it produced just 34 documents. Apple

[2] *See O'Donnell/Salvatori Inc. v. Microsoft Corp.*, 339 F.R.D. 275 (W.D. Wash. 2021) (motion to compel production of search term hits pursuant to an ESI Protocol at the outset of litigation); *FlowRider Surf, Ltd. v. Pac. Surf Designs, Inc.*, 2016 WL 6522807 (S.D. Cal. Nov. 3, 2016) (same); *BancPass, Inc. v. Highway Toll Admin., LLC*, 2016 WL 4031417 (W.D. Tex. July 26, 2016) (motion to compel production of search term hits pursuant to RFPs under Fed. R. Civ. P. 34(a)); *Finjan, Inc. v. SonicWall, Inc.*, 2020 WL 4192285 (N.D. Cal. July 21, 2020) (motion to compel production of unredacted transcripts and exhibits already produced with privilege redactions).

insisted it was done, but has since produced over 600 additional documents—still a paltry production, but one that dwarfs its initial production by more than an order of magnitude. And Apple insisted relevant documents exist only in the files of four custodians, but has now produced over 75% of its documents from the files of *other* custodians, which were identified by Epic. In short, Apple has demonstrated time and again its willingness to abuse the discovery process and mislead the Court. *See Epic Games, Inc. v. Apple Inc.*, 781 F. Supp. 3d 943, 997, 1004 (N.D. Cal. 2025) (sanctioning Apple for intentionally over-designating documents as privileged with a motivation to "delay proceedings" and "conceal Apple's real decisionmaking process"); *id.* at 952, 967-68, 1005 (finding that Apple's Vice President of Finance lied under oath and referring the matter for criminal investigation). It is only now, after Apple's continued refusal to apply a reasonable definition of responsiveness, that Epic seeks all documents responsive to its search terms, not to expand discovery, but as a remedy for Apple's abuses and so that Epic may sift the wheat from the chaff.

## II. The Low Responsiveness Rate Reflects Apple's Exceedingly Narrow Approach Toward Responsiveness, Not a Flaw in Epic's Search Terms

Epic's Motion showed that Apple's responsiveness review was deficient because, among other things, Apple produced fewer than 700 documents from the seven priority custodians and marked over 99% of the documents hitting on Epic's search terms non-responsive. Apple's principal factual defense is that its responsiveness rate "is a function of Epic's overbroad search terms and custodians." (Opp. at 8.) But Apple's data only highlights the defectiveness of Apple's responsiveness review.

Most tellingly, even Apple's own narrow search terms returned a very low number of responsive documents based on Apple's improper approach to responsiveness. Apple concedes that the search terms that Apple proposed on September 18—terms Apple presumably designed to capture the documents that it considers relevant—returned 5,879 documents in the seven Initial Custodians' files (9,808 with families). (Toscano Decl. ¶ 27.) Of those, Apple determined only 452 (590 with families) were responsive. (*Id.*) By Apple's own count, then, it deemed non-responsive 95.4% of the documents returned by its own overly narrow terms. (*Id.* (asserting that

"about 4.6%" of these documents "were determined to be responsive").) Apple therefore cannot blame its paltry production on the breadth of Epic's terms. Rather, the only explanation is that Apple is applying an unduly narrow standard of responsiveness.

Apple also fails to explain how "all non-privileged documents relating to the decision-making process" in the files of seven key custodians can possibly amount to 680 documents. (*See* Mot. at 2.) Those seven custodians include: the four people Apple has called the decision-makers (then-CEO Tim Cook, CFO Kevan Parekh, Head of the App Store Carson Oliver and his direct superior Eddy Cue); two lynchpin witnesses from the contempt hearing (longtime App Store leader Phil Schiller and senior finance executive Alex Roman); and another senior finance executive who attended at least one meeting that Apple admits is relevant to the commission proposed in its Proffer (Nate Barton). It is simply not credible that these key individuals possess only 632 documents responsive to Epic's requests. (*See id.*) While Apple argues that its decision-making process for the proffer proposal differed from the decision-making process at issue in the contempt proceedings (Opp. at 14), Apple fails to explain why this process, as well as the more ordinary course processes in the EU, Japan, and Brazil, would generate almost no ordinary-course business documents.

Indeed, Apple's arguments about the limited scope of its decision-making process are entirely irrelevant to the matter at hand given Apple's representation that it "agreed to address requests through custodial searches that went ***beyond*** the decision-making process." (Opp. at 6 (emphasis added).) Thus, unless Apple's use of the word "address" is a carefully ambiguous hedge, Apple should be producing documents responsive to Epic's requests even if they do not fall within Apple's extraordinarily circumscribed conception of what the decision-making process entailed. Nevertheless, Apple would have Epic and the Court believe that the central custodians listed above have just 632 documents, in aggregate, relating to topics such as "internal analyses of the financial or business impact of Apple's proposed linked-out commissions, alternative commissions, foreign commissions, and the zero-commission regime," which Apple says it agreed to search for and produce. (Opp. at 6.)

## III. Apple's Analysis of Case-Specific Terms and Categories of Withheld Documents Confirms That It Is Withholding Responsive Documents

In its opening brief, Epic showed that Apple is withholding almost all documents returned by search strings built around terms highly specific to this remand proceeding. (Mot. at 11.) Apple attempts to rebut this by citing search term results disclosed for the first time in its Opposition and categories of supposedly irrelevant documents it has withheld. Apple's examples only reinforce that Apple is withholding responsive documents.

According to Apple, 3,932 documents in the seven Initial Custodians' files contain at least one of the terms "proffer," "contempt," "injunction," "breakage," or "link out" (or its variants), and 450 of the responsive documents that Apple produced hit on one of those terms.[3] (Opp. at 12-13; Toscano Decl. ¶ 21.) Apple thus has withheld as non-responsive 3,482 of the 3,932 documents, or approximately 88.6%, in its executives' files that contain the core vocabulary of this proceeding. Of the 2,174 documents containing "link out" or its variants, Apple deemed only 426 responsive, withholding roughly 1,748, or about 80%. (Toscano Decl. ¶ 25.) Of the 716 documents hitting "injunction" within Epic's string, Apple deemed only 47 responsive, withholding about 93%. (*Id.* ¶ 24.) And of the 56 documents containing "proffer," Apple withheld 37—two-thirds of the documents in the Initial Custodians' files that refer to the filing whose genesis is at issue. (*Id.* ¶ 23.)

Apple attempts to hide from these statistics by noting that these terms "make up only a minuscule portion of the total documents with search term hits." (Opp. at 12.) That is beside the point. The question is not what fraction of the overall population the documents hit by this handful of terms represent, but whether Apple's treatment of the documents containing them is credible. Linking out is the subject of this remand. Apple's determination that four of every

[3] Paragraph 21 of the Toscano Declaration contains a discrepancy, in that the 3,932 figure is based on these five terms, while the 450 figure is based on these five terms except using "contempt*" (with a wildcard). Epic does not believe this makes a difference, because any word captured by the wildcard—such as "contemptuous" or "contemptible"—is sufficiently close in meaning.

five documents in its senior executives' files that mention link-outs are not relevant to these proceedings is itself compelling evidence that Apple's responsiveness standard is too narrow.

Apple's own descriptions of the withheld documents confirm the flaws in its approach. For example, Apple acknowledges that the withheld "link out" documents include documents "regarding the settlement related to link-outs in the *Epic v. Google* case." (Toscano Decl. ¶ 22 (referring to *In re Google Play Store Antitrust Litig*., No. 3:21-md-02981-JD (N.D. Cal.)).) But one of Apple's experts points to that settlement as one of his primary benchmarks justifying the commission that Apple has proposed here. (*See* Dkt. 1708-2 ¶¶ 30, 378, 390-93.) Likewise, Apple describes withheld documents that hit the term "breakage" as "financial summaries, revenue and pricing materials." (Toscano Decl. ¶ 26.) Those are clearly "genuine business records" that the Court stated it expected to see. (Aug. 11, 2026 Hr'g Tr. 8:15-17.) Notably, Apple gives *no* explanation of what the allegedly non-responsive documents containing the term "link out" and its variants discussed. (Toscano Decl. ¶ 25.)

Apple further argues that the volume of its production reflects a remand process that was "fundamentally different" from the 2023 link-entitlement process: just four decision-makers, a "finite set of meetings," reliance on outside experts, and "no Price Committee process and no business-team workstream." (Opp. at 3, 15.) As a threshold matter, Messrs. Schiller and Barton were on invites for this "finite set of meetings" with the named decision-makers, and nearly half of Apple's production to date comes from the files of Mr. Barton rather than from any of the four; clearly, the process was not as contained as Apple insists. Moreover, contrary to Apple's suggestion, Epic does not contend that the two processes were identical. Thus, for example, Epic has not sought the production of documents from nearly half of the prior custodians, such as user interface designers and the technical and software engineering teams that built and launched the link-out program, specifically because Epic expected the process to be different this time around. That said, there is no reason that one process would produce business records and the other would not. Nor does the significance of the comparison to the prior proceeding depend on the processes being precisely the same. The comparison is probative because the same seven custodians, or their predecessors, generated nearly 27,000 produced

documents in the contempt proceeding—including substantive emails, iMessages, presentations, and meeting notes—whereas Apple's production from those executives here contains no substantive internal communication about the rates Apple ultimately proposed, whether considered in the U.S. decision-making process or in the context of a process in another geography. (Mot. at 7, 10.)

## IV. The Requested Relief Is Proportionate, and Apple's Claims of Burden and Competitive Harm Are Unsubstantiated

In an attempt to avoid Epic's requested relief and delay these proceedings further, Apple argues that production of all documents hitting on Epic's search terms would be unduly burdensome. Apple's arguments are unconvincing.

As an initial matter, any burden associated with producing the documents hitting Epic's search terms is entirely of Apple's making. The documents that Epic seeks are documents that Apple should have produced months ago, when Apple was supposed to produce "all documents relating to the decision-making process leading to the proposal in its proffer." (Order ¶ 2.) The Parties and the Court are in this position, again, because Apple did not comply with its obligations at the outset. (*See* Dkt. 1017 at 2 (Court explaining that "[i]t is not in Apple's interest to do any [document production] quickly" when the "document production is all downside for Apple").) Nor should Apple be able to claim burden from producing additional documents that hit on Epic's search terms. If Apple had made proper responsiveness calls in the first instance, Epic would not be seeking this relief. Apple cannot use the burden of production to justify the improper review of documents. *See, e.g.*, *Peskoff v. Faber*, 251 F.R.D. 59, 62 (D.D.C. 2008) (holding that increased discovery costs were justified when they were "directly attributable to" a party's "inaction" and "unwillingness to take [its] discovery obligations seriously"); *cf. In re McKesson Governmental Entities Average Wholesale Price Litig.*, 264 F.R.D. 595, 603 (N.D. Cal. 2009) (holding that plaintiffs could not "avoid a review of relevant documents for privilege by arguing burden").

Any time pressure has likewise been created by Apple's conduct throughout the remand proceedings. Apple knew on May 20 what documents would be required for its proffer

production;[4] Apple knew on August 24 that it had not produced all responsive documents; to the extent this was not clear all along (a dubious proposition given the history of this case), Apple knew by no later than September 11 which specific categories of documents Epic expected it to produce; Apple knew on September 22 what search terms and custodians Epic requested; and Apple agreed on October 5 to run those search terms over those custodians. (*See* Mot. at 4-7.) Apple knew how many documents were involved in its collection and how many of those documents hit on Epic's search terms (including how many hit on the kind of terms Apple now highlights in its Opposition, like "feet" and "rated"). In fact, Apple never shared the hit counts for individual terms until its Opposition. Apple did not identify any specific burden concerns to Epic, much less substantiate those concerns, during the Parties' repeated meet-and-confers. Apple cannot now claim it is prejudiced by a time crunch it created. (*See* Dkt. 1017 at 2 (Court observing that "the way Apple announced out of the blue four days before the substantial completion deadline that it would not make that deadline because of a document count that it had surely been aware of for weeks hardly creates the impression that Apple is behaving responsibly").)[5]

Apple argues that it agreed to Epic's search terms to avoid any delays that might come from negotiating these terms. (Opp. at 7.) To begin with, Apple's suggestion that it has an incentive to move these proceedings along quickly, (Opp. at 18), is contradicted by Apple's repeated requests, at every level of the judiciary, that the proceedings be stayed, (Dkt. 1697 (moving before Judge Gonzalez Rogers to stay proceedings pending Supreme Court review)). *See Epic Games, Inc. v. Apple Inc.*, 2026 WL 1215632 (9th Cir. Apr. 28, 2026) (Ninth Circuit denying motion to stay its mandate pending Apple's cert petition); *Apple Inc. v. Epic Games, Inc.*, 2026 WL 1250097 (U.S. May 6, 2026) (Kagan, J., in chambers) (denying application for stay

---

[4] Despite Apple's claimed ignorance, the May 20 Order's use of parallel language to the Court's June 2024 order could leave no reasonable doubt as to what documents the Court required Apple to produce. (Mot. at 9 (comparing Order ¶ 2, with Dkt. 974).)

[5] Even so, if Apple wished to withhold from its production of all documents that hit Epic's search terms any documents that were captured *solely* because they returned a wildcard-driven word like "feel" or "feet," Epic would be willing to discuss such a proposal.

pending merits review by the Supreme Court). Regardless, Apple seeks to have it both ways: claiming that Epic's terms are so overbroad that reviewing all the hits constitutes an undue burden, while at the same time, agreeing to run these search terms to expedite discovery without requesting a meet-and-confer to negotiate their scope. (*See* Dkt. 1732-2 at 1.) Contrary to Apple's contention, Epic never "refused to negotiate to narrow" these search terms; Apple never asked. (Opp. at 17; Dkt. 1720 at 10 ("Apple has . . . refrained from rejecting any of Epic's proposed custodians or search terms at this time in the interest of facilitating a discovery process that is not stalled at the outset by protracted negotiations over appropriate search terms and custodians.").) Apple produced a hit report for the first time on November 6 (Even Decl. ¶ 7), only after Epic raised concerns with Apple's productions. And Epic learned about the hit counts of specific terms for the first time in Apple's Opposition two days ago. If Apple had sought to meet and confer on the scope of the terms, provided customary hit reports or made a counterproposal of narrowed terms, the Parties may have been able to negotiate a modestly narrower set of search terms *ab initio*. Apple's contention now that it is unduly burdened by its own agreement rings hollow.

Further, Apple vastly overstates the burden that would be required to comply with Epic's requested relief. Apple claims that Epic's requested relief would require it to conduct 17,000 hours of human review to ensure that every document produced has been screened for "privilege, confidentiality, personally identifiable information, trade secrets, commercially sensitive business information, source code, unannounced hardware product, and other protected materials." (Opp. at 15-16.) But Apple's argument ignores the tools already in place to mitigate these burdens.

*First*, Epic in no way suggests that Apple cannot review documents for privilege or to screen sensitive personal information. (*See* Mot. at 14-15.) Indeed, Epic's requested relief is designed to give Apple time to conduct privilege and confidentiality reviews over the requested documents prior to production. Epic's requested deadline of December 2 is 20 days after Epic gave Apple notice of its intent to file this motion. (*See* Dkt. 1732-3 at 2 (noting Epic's

November 12 email announcing its intent to file a motion to enforce Apple's production obligations).)

*Second*, Apple has not substantiated that reviewing for privilege and personal information would be a substantial burden. Apple has not identified the prevalence of these documents in its collections; it has simply asserted they exist. (*See* Toscano Decl. ¶ 11.) Nor has Apple provided any indication of how long it would take to conduct *only* privilege and personal sensitivity reviews, or that it would be unable to complete these privilege reviews in the 20 days available under Epic's proposed schedule. Apple should also be able to use search terms and technological review tools to identify potentially privileged or personally sensitive documents. It is common for reviewers to apply a privilege screen to identify potentially privileged documents that are part of a document review. *See, e.g.*, *Practical Magic, LLC v. Petzinger*, 2024 WL 1191066, at *2 (C.D. Cal. Mar. 5, 2024). Likewise, Apple's examples of sensitive documents—medical records and executives' tax returns (*see* Opp. at 17)—are likely to have common keywords/terms across each type of record (*e.g.*, "doctor," "hospital," "medical," "health insurance," "treatment," "healthcare" for medical records; "SSN," "social security," "IRS," "internal revenue" for tax returns), such that Apple could conduct targeted screens for these documents without needing to manually review all documents in Apple's production universe for this information. Indeed, it is likely that Apple has already applied similar methods in its initial review.

*Third*, the operative Protective Order allows for the designation of materials as HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY, limiting disclosure of "extremely sensitive" information to Epic's outside counsel and certain agreed-upon in-house counsel. (Dkt. 274 ¶¶ 2.8, 7.3.) Epic is willing to stipulate that Apple could produce all requested documents with provisional designations of HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY, subject to a subsequent de-designation of documents. (*See id.* ¶ 5.2 (allowing for such provisional designations by stipulation or order).) This would substantially mitigate Apple's claim that reviewing all documents prior to production poses an undue burden on Apple. Further, Apple cannot seriously claim that documents produced as HIGHLY CONFIDENTIAL – ATTORNEYS'

EYES ONLY would be subject to risk of disclosure or improper use: In the course of over six years of litigation, Apple has produced HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY documents on countless occasions with no incidents of misuse by Epic.

Apple's cited authority supporting the non-financial burdens of its production obligations is inapposite to these proceedings. In *Realtek Semiconductor Corp. v. MediaTek, Inc.*, the trial court dismissed the plaintiff's complaint and stayed discovery based not merely on a generalized risk of disclosing sensitive documents in litigation, but rather on the risk that sensitive documents may be disclosed to a plaintiff who may never bring a new claim against the defendant. 732 F. Supp. 3d 1101, 1118 (N.D. Cal. 2024). Indeed, the *Realtek* court allowed the plaintiff to move for discovery "upon a particularized showing that specific proposed discovery is necessary for it to prepare its amended complaint." *Id.* Likewise, in *Gray v. Faulkner*, the court's "reluctan[ce] to order the unconditional production of documents" was motivated by a unique concern: prison safety. *See* 148 F.R.D. 220, 223 (N.D. Ind. 1992). *Gray* involved a prison inmate seeking documents related to prison security and personal details of other inmates, when no agreed protective order had been entered to limit their disclosure to the plaintiff. *See id.* at 223-24. The concerns illustrated in these cases are far afield from this case. Epic does not seek discovery of documents to support speculative claims at the outset of litigation; Epic seeks documents that the Court has already *ordered* Apple to produce as a part of post-trial proceedings.

**V. Alternative Remedy**

If, in the alternative, the Court is inclined to order review of a sample of documents to test Apple's claims that documents are irrelevant, Apple's proposal should not be accepted. The referral of document reviews to a special master would add delay and cost, as the Parties would need to negotiate over a proposed special master, retain the special master, set up a process to send documents to the special master for review and (if warranted) challenge the special master's determinations before this Court. In the previous contempt proceeding, this process took six months from the special masters' appointment in December 2024 to the final determinations in May 2025. (*See* Dkt. 1068; Dkt. 1615.) Additionally, the typical justification for special master review—to assess claims of attorney-client privilege without disclosing the

privileged material to an opposing party—is not present here.[6] Moreover, while a special master is well suited to evaluate claims of privilege—which involve determinations of privilege law relatively disconnected from the merits of a dispute—a review for responsive documents *requires* understanding the merits to determine if documents are relevant, such that the parties are better suited to identify responsive documents accurately and efficiently. And Apple's concerns related to confidentiality are appropriately mitigated by the operative Protective Order in this case. (*See supra* Section IV.) If the Court chooses to order a sample review—which Epic contends to be unwarranted—the Court should allow Epic to review the documents in the first instance, so the Parties may resolve their dispute over relevant documents without introducing additional sources of delay and cost.

* * *

Epic's Motion demonstrated that Epic is entitled to its requested relief. In its Opposition, Apple presents, for the first time, analyses it argues show that Epic's search terms are overbroad, such that producing these documents would constitute an undue burden. But the data tell a different story. Even under *Apple's* own proposed terms, Apple contends that exceedingly few documents are responsive. Common sense also tells a different story. It cannot be that the seven Initial Custodians have just 680 documents that are responsive to Epic's requests—unless Apple is applying extraordinarily stringent responsiveness criteria. Given Apple's history of thumbing its nose at Court orders in this matter, Apple can no longer be trusted to fix the problem itself. This Court should order the requested relief.

[6] Epic does not currently dispute Apple's claims of privilege or seek Apple's production of privileged documents.

Dated: November 20, 2026

Respectfully submitted,

By: */s/ Gary A. Bornstein*

**FAEGRE DRINKER BIDDLE & REATH LLP**

Matthew J. Adler (SBN 273147)
matthew.adler@faegredrinker.com
Four Embarcadero Center
San Francisco, California 94111
Telephone: (415) 591-7500
Facsimile: (415) 591-7510

**CRAVATH, SWAINE & MOORE LLP**

Gary A. Bornstein (*pro hac vice*)
gbornstein@cravath.com
Yonatan Even (*pro hac vice*)
yeven@cravath.com
Lauren A. Moskowitz (*pro hac vice*)
lmoskowitz@cravath.com
Michael J. Zaken (*pro hac vice*)
mzaken@cravath.com
M. Brent Byars (*pro hac vice*)
mbyars@cravath.com

375 Ninth Avenue
New York, New York 10001
Telephone: (212) 474-1000
Facsimile: (212) 474-3700

*Attorneys for Plaintiff and Counter-defendant Epic Games, Inc.*